**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARGARET L. SHEPARD,

     *Plaintiff,*

*v.*                         CASE NO. 12-CV-14386

COMMISSIONER OF         DISTRICT JUDGE PAUL D. BORMAN
SOCIAL SECURITY,        MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 16.)

Plaintiff Margaret L. Shepard was 52 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 9  at 39.) Plaintiff's employment history includes work as a cashier for one year, an assembler for six years, and a postal carrier for seven years. (Tr. at 146.) Plaintiff filed the instant claim on July 16, 2010, alleging that he became unable to work on January 30, 2002. (Tr. at 119.) The claim was denied at the initial administrative stage. (Tr. at 71.) In denying Plaintiff's claim, the Commissioner considered affective disorders and disorders of back (discogenic and degenerative), as possible bases for disability. (*Id.*) On July 20, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Dennis M. Matulewicz, who considered the application for benefits *de novo*. (Tr. at 17-32, 33-70.) In a decision dated August 9, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 29.) Plaintiff requested a review of this decision on August 16, 2011. (Tr. at 14-16.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 17, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On October 3, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations

3

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party");
*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

Judicial review of the ALJ's decision is direct, "but we play an 'extremely limited' role." *Simila v. Astrue,* 573 F.3d 503, 513-14 (7th Cir. 2009). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). Just as "'[n]o trial is perfect,' . . . no administrative hearing or opinion is either[;] thus, in analyzing an ALJ's decision, a reviewing court is to look for 'fatal gaps or contradictions' and not 'nitpick' in search of essentially meaningless missteps." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1965 (N.D. Ill. 2011).

## C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff last met the insured status requirements on June 30, 2007, and that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of January 30, 2002, through her date last insured of June 30, 2007. (Tr. at 22.) At step two, the ALJ found that Plaintiff's bipolar/depression, obsessive-compulsive personality disorder ("OCD"), carpal tunnel syndrome ("CTS") (status post carpal tunnel release in 1997-98), complex regional pain syndrome, lumbar spondylosis (degenerative disc disease), and neuropathy of the hands and feet were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 23-24.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. at 27-28.) At step five, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 24-27.) The ALJ also found that Plaintiff was a younger individual (i.e., between the ages of 18 and 49) on the date last insured. (Tr. at 28.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 29.)

### E.    Administrative Record

### 1.    Evidence before expiration of insured status

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff underwent carpal tunnel release surgery in 1997 and 1998. (Tr. at 43.)

On November 21, 2000, Dr. Joseph Meerschaert, M.D., noted that Plaintiff "continues to have hypersensitivity over the wrists on the right and on the left" and that she "has a positive

Phalen's as well as weakness in the thumb opposition." (Tr. at 242.) Plaintiff's restrictions from doing repetitive activities or use of her hands was continued. (Tr. at 242, 244.)

On December 8, 2000, Dr. Meerschaert diagnosed complex regional pain disorder type I or II in Plaintiff's hands. (Tr. at 229-30.) Plaintiff reported pain in her hands, feet and elbow in Janaury 2001. (Tr. at 239.) On May 10, 2001, Dr. Meerschaert clarified that Plaintiff's complex regional pain disorder was type II. (Tr. at 232.)

On September 10, 2002, x-rays of Plaintiff's colon were "[n]ormal . . . with the exception of a few scattered diverticuli." (Tr. at 467.)

Plaintiff was also treated by Narin Tanir-Avci, M.D., from 2000 through 2010. (Tr. at 281-449, 471-510.) In 2002, Plaintiff began reporting left knee pain. (Tr. at 399-404.)

An ultrasound of Plaintiff's lower extremities taken on January 14, 2003, was "unremarkable." (Tr. at 453.) X-rays of Plaintiff's knees taken on February 18, 2003, were "negative." (Tr. at 449.)

Although Plaintiff was scheduled for physical therapy on her knee, on August 28, 2003, Accelerated Rehabilitation Centers indicated that Plaintiff was "formally discharged" because although Plaintiff attended one session on August 6, 2003, she "then cancelled her next 3 consecutive scheduled treatment sessions and did not schedule thereafter." (Tr. at 435.)

On September 3, 2003, Plaintiff began treatment with John R. Olenyn, M.D., for right knee pain. (Tr. at 436.) Dr. Olenyn noted that "[x]-rays of the knee show minimal degenerative changes" and recommended anti-inflammatory prescription medication and elastic support. (Tr. at 437.) In 2003, Plaintiff also underwent gastric bypass surgery. (Tr. at 382, 409, 412.)

On June 3, 2004, an ultrasound of Plaintiff's abdomen showed "[p]ossible fatty metamorphosis of the liver[,]" "[c]holelithiasis without evidence for cholecystitis or biliary ductal

dilation" and "[n]o renal mass or hydronephrosis" or "abdominal aortic aneurysm or free intreaperitoneal air." (Tr. at 441-42.) X-rays of Plaintiff's chest taken the same day were "normal." (Tr. at 452.) X-rays of Plaintiff's right foot showed a "small plantar spur, otherwise negative AP and lateral study of the foot." (Tr. at 454.)

An MRI of the lumbar spine taken on July 19, 2006, showed "multi-level degenerative disc disease/desiccation." (Tr. at 456.) X-rays of the right foot taken on September 19, 2006, showed a "[t]iny inferior calcaneal spur" with all else "appear[ing] intact." (Tr. at 457.)

On November 8, 2006, an abdominal ultrasound showed "cholelithisasis without sonographic evidence of cholecystitis." (Tr. at 462.) On November 14, 2006, Plaintiff underwent a "laparoscopic cholecystectomy with lysis of adhesions." (Tr. at 465-66.)

### 2.   Evidence after June 30, 2007, the date last insured

Plaintiff was also treated by Nadine S. Jennings, M.D., at Pain Care Associates. (Tr. at 515-18, 526-47.) On September 6, 2007, Dr. Jennings conducted motor nerve, sensory nerve, and EMG studies and found "mild underlying sensory peripheral neuropathy, decreased amplitude right median conductions consistent with previous carpal tunnel release," and "no electrodiagnostic evidence of a cervical radiculopathy." (Tr. at 544-45.) On October 4, 2007, Dr. Jennings recommended that Plaintiff "resume her lumbar exercises and do some type of aerobic exercise or walking." (Tr. at 543.)

On September 30, 2008, Dr. Tanir-Avci noted that Plaintiff reported being depressed and was crying often because a "p[atien]t that she took care of died" and, although she had "tried to be strong initially[,] [she reported that] she can't manage." (Tr. at 307.) On November 31, 2008, Dr. Tanir-Avci noted that Plaintiff's psychiatric profile was "much better." (Tr. at 315.) On March 20 and April 6, 2009, Dr. Tanir-Avci noted that Plaintiff's psychiatric profile was "stable." (Tr.

at 329, 331.) On June 2, 2009, Dr. Tanir-Avci noted that Plaintiff was "depressed." (Tr. at 335.) On July 2, 2009, Dr. Tanir-Avci noted that Plaintiff "states still feel[ing] down[,] not crying but low energy [and] motivation." (Tr. at 341.)

Plaintiff was also treated by Antonia Sanchez-Murphy, M.A., from October 2008 through June 2011 for depression and anxiety. (Tr. at 550-98.)

A bone density test performed on Plaintiff's right forearm on August 10, 2009, was "benign[.]" (Tr. at 370-71.) On September 1, 2009, Plaintiff underwent a esophago-gastroduodenoscopy which was normal, resulting in a post-operative diagnosis of "[g]astritis, hiatal hernia, colitis, diverticulosis." (Tr. at 382-83, 386-87.)

Plaintiff was admitted to the hospital on December 23, 2009, because of a drug overdose and suicide attempt. (Tr. at 200, 617-22.) On February 5, 2010, Plaintiff was discharged from Intensive Outpatient Treatment at the Hillside Center for Behavioral Services because her "[p]resenting symptoms appear to have improved." (Tr. at 381.)

On February 24, 2010, Dr. Jennings noted that Plaintiff had suffered a breakdown and had attempted suicide in December 2009, over the holidays. (Tr. at 522.) Dr. Jennings noted that Plaintiff "reports that she has been diagnosed with bipolar disorder and panic attacks." (*Id.*) Dr. Jennings indicated that Plaintiff had "full range of motion of the lumbar spine" and that "[m]otor examination demonstrates weakness of the quadriceps on the left at 4/5 [but that] [t]he remainder of motor strength testing is full." (Tr. at 522.)

An MRI of the lumbar spine taken on February 26, 2010, when compared to the MRI of July 19, 2006, was "stable." (Tr. at 519.)

On March 16, 2010, Dr. Jennings conducted a motor nerve, sensory nerve and EMG study and summarized that it was a "normal study of the left lower extremity and lumbar paraspinals"

with "no electrodiagnostic evidence of a left lumbar radiculopathy or generalized peripheral neuropathy." (Tr. at 518.)

On July 12, 2010, Dr. Jennings noted that "[s]ensation is diminished to pinprick over all the fingertips" and that "Tinel sign is positive at the wrist on the right." (Tr. at 515.) Dr. Jennings diagnosed complex regional pain syndrome of the upper extremities, cervical pain, lumbar spondylolisthesis, and noted bipolar disorder with panic attacks. (*Id.*) Dr. Jennings recommended "a course of outpatient physical therapy" and she "discussed taking some classes at a local community center or volunteering a few hours a week, which I think would be very beneficial to her." (Tr. at 515-16.)

On June 7, 2011, Ms. Sanchez-Murphy completed a Mental Capacities Evaluation of Plaintiff's condition on or before June 30, 2007. Sanchez-Murphy estimated that Plaintiff's degree of difficulty in maintaining social functioning and estimated degree of restriction of activities of daily living were seriously limited but not precluded. (Tr. at 599-600.) The degree of deficiencies in concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner was estimated to be "cannot meet competitive standards." (Tr. at 600.) In addition, Sanchez-Murphy also found that Plaintiff could not meet competitive standards as to her estimated degree of deterioration or decompensation in work or work-like settings and in her ability to understand, carry out and remember simple instructions. (*Id.*) However, Sanchez-Murphy also found that Plaintiff's ability to perform simple tasks on a full time basis, to use judgment, to perform work requiring regular contact with others, to relate appropriately to supervisors and co-workers, to relate appropriately to the public, to maintain socially appropriate behavior, and to make simple work-related decisions were seriously limited but not precluded. (Tr. at 601-02.) Finally, Sanchez-Murphy concluded that Plaintiff could not meet competitive standards as to

independently perform repetitive tasks, sustain concentration to task, sustain attention to task, achieve quantity and quality goals, respond to time limits, respond appropriately to usual work situations, respond appropriately to changes in a routine work situation, or respond appropriately to the stress of customary work pressures in a work environment. (*Id.*) Sanchez-Murphy also found that Plaintiff was seriously limited, but not precluded, in the ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and to respond appropriately to supervision. (Tr. at 603.) Finally, Sanchez-Murphy found that Plaintiff could not meet competitive standards as to the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace. (*Id.*)

Tariq Abassi, M.D., also completed a portion of the Mental Capacities Evaluation which mimicked Ms. Sanchez-Murphy's findings and concluded that Plaintiff's impairments caused marked limitations in all the categories answered and, thus, that Plaintiff's impairments equal a Listing. (Tr. at 606-10.)

At the administrative hearing, Plaintiff testified that she is married with three adult children, one of whom lives with her. (Tr. at 39.) In addition, Plaintiff testified that her mother-in-law lives in their home. (Tr. at 39-40.) When asked whether anything happened on the alleged onset date, Plaintiff responded that she "was more or less fired" based on an incident where she "was at the grocery store and picking a few things and some of the - - I had a big purse and some of the lunch meat had slipped in my purse so I was accused of shoplifting." (Tr. at 40-41.) Plaintiff stated that she has a driver's license but has problems driving long distances because of her hands. (Tr. at 42.) Plaintiff was wearing braces on her hands and when the ALJ asked when the last time was that Plaintiff had surgery on her hands, Plaintiff responded, "'97 and '98." (Tr. at 43.) Plaintiff indicated that she got the braces ten years ago and that she has a whole box of braces at home. (*Id.*)

When asked whether they help, Plaintiff responded, "Yes, but at times when [her hands] are really hurting, they make them worse." (*Id.*) When asked whether her hands are better, the same, or worse since June 2007, Plaintiff responded that they are worse, and added that her "hands are a lot weaker and they throb all the time." (*Id.*)

Plaintiff testified that she has " a lot of problems concentrating and I have a lot of problems being around a lot of people." (Tr. at 43-44.)  When asked when these problems started, Plaintiff responded, "it started happening in 2007." (Tr. at 44.)  Plaintiff referred to some family difficulties and indicated that she "was trying to hold it together for my kids and then I just snapped one day." (Tr. at 45.) When the ALJ asked when that happened, Plaintiff responded, "2008" and "2009." (Tr. at 45-46.) Plaintiff stated that she had a nervous breakdown and tried to commit suicide in 2009, two days before Christmas. (Tr. at 49.)

Plaintiff indicated that she has pain in her hands, back, feet and right knee. (Tr. at 47.) Plaintiff stated that she had surgery on her right knee in 2007. (Tr. at 47.) When asked whether she could lift a gallon of milk, Plaintiff responded, "Not really." (Tr. at 47-48.) When asked by her attorney whether she has any difficulties dressing, Plaintiff responded, "usually I have my husband or my mother-in-law or my daughter if I have buttons to have to button I have them button them and then I try to find shoes if they need to be tied . . . I can do the velcro." (Tr. at 52.) Plaintiff indicated that she "can't walk a mile or anything, but I, you know, can like walk out to my car but my back does hurt." (Tr. at 48.) Plaintiff testified that she can write as long as she uses a large pen, that she shares the cooking responsibilities with her husband, and that she is able to care for her own personal hygiene. (Tr. at 53.)

When asked how long she naps or rests lying down throughout the day, Plaintiff responded, "Probably over half the day." (Tr. at 54.) When asked how it was in 2007, Plaintiff responded,

"Well, in 2007, it wasn't quite as bad, but as time has gone on, it has gotten worse." (*Id.*) When asked whether she could stoop or crawl in 2007, Plaintiff responded, "I could probably not on a daily basis, but I could do it now and then." (Tr. at 57.) Plaintiff also stated that she hasn't been able to use a can opener "for years" and that she could only type one finger "now and then, but it would depend on my pain level" in 2007. (Tr. at 60.) As to her ability to reach and grab something, Plaintiff responded, "Back then I could do it easier than I can do it now . . . ." (Tr. at 57.) On a normal day in 2007, Plaintiff stated that her pain level with medication was "a two or three[.]" (Tr. at 57-58.) When asked by her attorney what pain she experienced on a bad day in June 2007, Plaintiff stated that her pain "could get up to an eight" and that she had bad days "[a]t least once or twice a week." (Tr. at 58.) Plaintiff also stated that in 2007 she had crying spells "[m]aybe like two or three times a day" that would last "[m]aybe 10/15 minutes." (Tr. at 58.)

The ALJ asked the vocational expert ("VE") to assume a person with Plaintiff's background who

> could lift 20 pounds maximum/10 pounds frequently/20 pounds occasionally; sit six hours of an eight-hour work shift; stand and/or walk two hours of an eight-hour work shift; would require a sit/stand at will option; never use ladders, scaffolds, or ropes; only occasionally use ramps or stairs; stoop, kneel, crouch, crawl, or balance; avoid all concentrated exposure to hazards including dangerous and unprotected machinery or heights; only occasionally bend, twist, turn at the waist or neck; frequently but not constantly handle, finger, feel with the right or left upper extremity; only carry out simple, unskilled work with an SVP rating of one or two and work requiring brief superficial contact with the general public and routine work that would not require changes or adaptations in work settings or duties more than once a month.

(Tr. at 61-62) The VE responded that such a person could not return to Plaintiff's past relevant work. (Tr. at 62.) The VE further testified that such a person could perform the 3,200 bench assembler, 1,200 sorter, and 1,000 packer jobs available at the light unskilled level in Southeastern Michigan. (Tr. at 62-63.) When asked whether her testimony was different from or inconsistent

with the Dictionary of Occupational Titles ("DOT"), the VE responded, "It is consistent with the DOT. However, the DOT does not address the ability to sit and stand while performing work tasks and that information is based on my professional work experience." (Tr. at 63.) When asked whether she relied on any other sources in giving her testimony, the VE responded, "I utilized the selected Characteristics of Occupations and the Department of Labor Bureau of Labor Statistics." (*Id.*) When asked by Plaintiff's attorney whether less than occasional use of one's hands would preclude the jobs listed, the VE responded that it would. (Tr. at 65.) When asked whether an addition of lifting only 10 pounds occasionally to the ALJ's hypothetical would affect the jobs listed, the VE responded that the packer job would be eliminated but that the others would still be available. (*Id.*)

### F.     Analysis and Conclusions

### 1.     Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of light work. (Tr. at 24-27.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.   Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 13.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that: (1) "Despite finding that Mrs. Shepard has severe impairments of reflex sympathetic dystrophy syndrome complex and carpal tunnel syndrome, the ALJ committed reversible error in finding that her sole manipulative limitation is a preclusion from constant fingering, handling or feeling with both upper extremities" (Doc. 13 at 12-15); (2) "Given the lack of any medical evidence supportive of the ALJ's residual functional capacity finding, the ALJ's assessment cannot be based on substantial evidence" (*id.* at 15-17); (3) "The's [sic] credibility finding is not supported by substantial evidence" (*id.* at 17-21); and (4) "The Commissioner failed to sustain his burden of establishing that there is other work in the national economy that Mrs. Shepard can perform." (*Id.* at 21-25).

### a.   Credibility Analysis

In the instant case, the ALJ determined that Plaintiff's "allegations regarding the symptoms of her impairments and her resulting limitations are not entirely consistent with the objective medical evidence and the undersigned further notes that the factors listed in SSR 96-7p support a finding that the claimant's complaints are credible only to the extent that they are consistent with the residual functional capacity assessment set forth above." (Tr. at 27.) I suggest that substantial

16

evidence supports the ALJ's credibility finding and resulting RFC analysis and that these findings are sufficiently intertwined as to render consideration of them together most efficient.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645, at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y*

17

*of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; SSR 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); SSR 96-7p, at *5.

18

In the instant case, the ALJ thoroughly considered each of the above factors. (Tr. at 24-27.) I suggest that substantial evidence supports the ALJ's findings. I note, at the outset, that Plaintiff's reliance on GAF scores ranging from 40 to 68 between 2008 and 2011 to undermine the ALJ's credibility findings is misplaced. (*See* Doc. 13 at 20-21.) Even if they could be considered relevant to the time period before June 30, 2007, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). The GAF scores, therefore, are not raw medical data; therefore, any decision not to rely on the GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See also Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Social Security Admin.*, 110 F. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that the plaintiff could perform simple and routine work despite GAF score of 35).

As to the timing of the most relevant evidence, in order to be eligible for disability insurance benefits, a person must become disabled during the period in which he or she has met the statutory special earnings requirements. 42 U.S.C. §§ 416(i)(2)(c); 423(a), (c-d). "If a clamant is no longer insured for disability insurance benefits at the time she files her application, she is entitled to disability insurance benefits only if she was disabled before the date she was last insured." *Renfro v. Barnhart*, 30 F. App'x 431, 435 (6th Cir. 2002). Therefore, the ALJ generally only considers evidence from the alleged disability onset date through the date last insured. *King*

*v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205-06 (6th Cir. 1990). "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Social Security Admin.,* 88 F. App'x 841, 845 (6th Cir. 2004). In order for evidence of the plaintiff's condition after the date last insured to be relevant to the disability decision, the evidence "must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). If the plaintiff becomes disabled after the loss of insured status, the claim must be denied even though the plaintiff has indeed become disabled. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

During the relevant time period in this case, i.e., before June 30, 2007, there is no evidence of any mental health issues or treatment. As the ALJ noted, Plaintiff began seeing a therapist in 2008. (Tr. at 26.) The first mention of any mental health symptoms in the record appears on September 30, 2008, when Dr. Tanir-Avci noted that Plaintiff reported being depressed and was crying often because a "p[atien]t that she took care of died" and that, although she had "tried to be strong initially[,] [she reported that] she can't manage." (Tr. at 307.) I also note that this statement suggests that Plaintiff was able to perform some work taking care of another person. Of course, Plaintiff's symptoms peaked on December 23, 2009, when she was hospitalized because of a drug overdose and suicide attempt. (Tr. at 200, 617-22.) However, that occurred more than two years after the expiration of Plaintiff's insured status. Therefore, I suggest that the ALJ's finding that Plaintiff's mental impairments were not disabling as of the date last insured is supported by substantial evidence.

As to physical impairments, although Plaintiff continued to have hand pain even after carpal tunnel release surgery, I suggest the ALJ's findings that these symptoms did not preclude her from

working as of the date last insured are supported by substantial evidence. (Tr. at 27.) Closely following the expiration of the date last insured, on September 6, 2007, Dr. Jennings conducted motor nerve, sensory nerve, and EMG studies and found only "mild underlying sensory peripheral neuropathy, decreased amplitude right median conductions consistent with previous carpal tunnel release" and "no electrodiagnostic evidence of a cervical radiculopathy." (Tr. at 544-45.) On October 4, 2007, Dr. Jennings recommended that Plaintiff "resume her lumbar exercises and do some type of aerobic exercise or walking." (Tr. at 543.) Dr. Jennings' recommendations are inconsistent with disabling symptoms. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011) (modest treatment inconsistent with a finding of disability); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). In addition, Plaintiff's degenerative disc disease was stable from 2006 through 2010. (Tr. at 456, 519.)

I therefore suggest that the ALJ's credibility findings should be upheld.

### b. RFC Analysis

As to the ALJ's RFC analysis, for the same reasons as stated above, I suggest that the ALJ's findings are supported by substantial evidence. I also note that during the relevant time period, i.e., before June 30, 2007, Plaintiff's treatment for her physical impairments was modest, consisting of prescription medication and suggested physical therapy and exercise programs. In addition, Plaintiff did not receive any treatment for any mental impairments during this time period.

I further note that Plaintiff testified that the occurrence that established the alleged onset date was an accusation of shoplifting and not any physical or mental inability to work. (Tr. at 40-41.) In addition, Plaintiff testified that from 2007 until the date of the hearing, the pain in her hands worsened. (Tr. at 43.) Plaintiff also testified that her concentration problems and challenges with being around people "started happening in 2007." (Tr. at 44.) After Plaintiff described having

"snapped one day" and the ALJ asked when that occurred, Plaintiff stated that it was in 2008 or 2009. (Tr. at 45-46.) In addition, when asked about her need to rest throughout the day, Plaintiff indicated that in 2007, "it wasn't quite as bad, but as time has gone on, it has gotten worse." (Tr. at 54.) When asked whether she could stoop or crawl in 2007, Plaintiff responded, "I could probably not on a daily basis, but I could do it now and then." (Tr. at 57.)

I therefore suggest that even assuming, *arguendo*, that Plaintiff's mental and physical impairments are currently disabling, the ALJ properly found that the claim must be denied due to lack of evidence of disability at the date last insured. *See Moon, supra.*

Finally, I note that Plaintiff's argument regarding the DOT classifications does not undermine this finding. Plaintiff argues that although the ALJ recognized and discussed the fact that the DOT does not address sit/stand options, the "ALJ did not list any other inconsistencies. However, the VE's testimony that an individual who is limited to standing and walking for just *two hours* in an 8-hour workday can perform three light jobs is also inconsistent with the DOT as light work entails standing and walking for at least *six hours* a day" and that an "individual who is limited to frequent handling, fingering and feeling could not perform work as a packer, which entails *constant* fingering and feeling." (Doc. 13 at 23 (emphasis in original).)

At the administrative hearing, the ALJ asked the VE whether her testimony was different from or inconsistent with the DOT and the VE responded, "It is consistent with the DOT. However, the [DOT] does not address the ability to sit and stand while performing work tasks and that information is based on my professional work experience." (Tr. at 63.) When asked whether she relied on any other sources in giving her testimony, the VE responded, "I utilized the selected Characteristics of Occupations and the Department of Labor Bureau of Labor Statistics." (*Id.*) Plaintiff's counsel then asked whether less than occasional use of one's hands would preclude the

jobs listed, the VE responded that it would. (Tr. at 65.) When asked whether an addition of lifting only ten pounds occasionally to the ALJ's hypothetical would affect the jobs listed, the VE responded that the packer job would be eliminated but that the others would still be available. (*Id.*)

Plaintiff's counsel had an opportunity and exercised that opportunity to inquire into the specific requirements of the jobs listed by the VE. However, counsel did not identify the conflicts he now raises. This alone is fatal to his argument. *See Aho v. Comm'r of Soc. Sec.*, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011) (citing *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002) ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late.")).

In addition, "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct." *Martin v. Comm'r of Soc. Sec.*, 179 F. App'x 369, 374 (6th Cir. 2006). Therefore, I suggest that the ALJ was not under any obligation to inquire further into the accuracy of the VE's testimony beyond asking whether the VE's testimony was consistent with the DOT and receiving the VE's response that it was and that she also utilized another Bureau of Labor publication. *See Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) ("Nothing in the applicable Social Security regulations requires an administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy"). I therefore suggest that the ALJ did not commit any error undermining the substantial evidence that supports the decision.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

**III.   REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                        s/ *Charles E Binder*
                                        CHARLES E. BINDER
Dated: September 17, 2013               United States Magistrate Judge


**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  September 17, 2013            By    s/Patricia T. Morris
                                     Law Clerk to Magistrate Judge Binder